IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| STEPHEN CRANSKA,<br><br>Plaintiff,<br><br>vs.<br><br>UMIA INSURANCE, INC.; AMERICAN CASUALTY COMPANY OF READING PENNSYLVANIA; PREFERRED PHYSICIANS MEDICAL RISK RETENTION GROUP; and JOHN DOES 1-15,<br><br>Defendants. | CV 21–104–M–DLC<br><br>ORDER |

Before the Court are Defendant Preferred Physicians Medical Risk Retention Group's ("PPM") Motion for Summary Judgment (Doc. 52), Defendant American Casualty Company of Reading Pennsylvania's ("ACCO") Motion for Summary Judgment (Doc. 54), and Defendant UMIA Insurance, Inc.'s ("UMIA") Motion for Summary Judgment (Doc. 59.) A hearing on the motions was held on December 21, 2023. For the reasons discussed below, the Court grants in part and denies in part the summary judgment motions. The Court will address the remaining outstanding motions by separate order.

## FACTUAL BACKGROUND[1]

On February 12, 2019, Plaintiff Stephen Cranska underwent prostate surgery at Kalispell Regional Medical Center ("KRMC"). At the time of Cranska's surgery, Defendant UMIA was the insurance carrier for KRMC; Defendant PPM was the insurance carrier for Dr. Cory Robertson of Northern Rockies Anesthesia Consultants ("NRAC"); and Defendant ACCO was the insurance carrier for Flathead Valley Community College ("FVCC") and its paramedic students.

Prior to the surgery, Cranska signed a "Patient Consent and Financial Agreement" form that included an acknowledgement that "resident physicians and other healthcare services education students may participate in or be observers of the Healthcare Services you receive at [KRMC]." Cranska also signed a "Patient Informed Consent/Refusal" in which he consented "to the admittance of students, healthcare employees in the performance of their job, and others involved in the delivery of healthcare services, for purposes of education." In addition, Cranska signed a "Consent for Anesthesia Services" that expressly confirmed his understanding that the risk of anesthesia included, *inter alia*, "injury to mouth, airway, [and] esophagus."

FVCC had an agreement with KRMC that allowed FVCC paramedic

[1] The following facts are taken from the parties' undisputed and stipulated facts, as well as those facts the Court deems to be substantively undisputed based on the evidence before the Court.

students to receive training at KRMC. On the day of Cranska's surgery, FVCC student Timothy Olson was at KRMC training for intubations. Olson attempted an intubation of Cranska but misplaced the tube in Cranska's esophagus. Dr. Robertson, the anesthesiologist for Cranska's procedure, took over and successfully completed the intubation.

Several hours after the surgery, Cranska complained of a sore throat and difficulty breathing. Dr. Katherine Kasavana, an internal medicine physician and hospitalist with KRMC, saw Cranska and initially diagnosed him with an allergic reaction. When Cranska did not improve, further diagnostic tests were performed and Cranska was diagnosed with a perforated esophagus. Cranska remained hospitalized, requiring additional surgery to repair his esophagus and treatment for a subsequent infection.

Initial Presentation of Claim & Investigations

On October 28, 2019, Cranska presented his medical malpractice claim to NRAC and KRMC through a letter from his attorney, Lee Henning. The letter explained that Cranska was pursuing "a medical malpractice claim related to a perforated esophagus he suffered on 2/12/2019 at [KRMC]." The letter outlined the relevant factual background and identified several legal theories underlying Cranska's claim, including a lack of informed consent to allow a paramedic student from FVCC to practice his intubation technique on Cranska, the failed intubation

attempt itself, a failure to properly document the difficulties with intubation, and the delay in diagnosing Cranska's injuries.

The letter did not include a settlement demand and stated that Cranska's damages had not yet been evaluated "in detail." The letter also did not include any expert opinion on the alleged breach of the standard of care or causation. The letter stated "[w]e have not yet had this case evaluated by a medical expert, and we are not medical professionals ourselves." The letter went on to state that counsel understood "esophageal perforation during intubation is a known—but extremely rare—risk of anesthesia" and that "much more information is necessary to investigate" counsel's various legal theories. However, the letter also stated that Cranska's counsel believed "from the totality of the circumstances" liability was "reasonably clear."

*PPM \ NRAC \ Dr. Robertson*

On February 25, 2019, after speaking with Cranska, Dr. Robertson reported Cranska's complications to PPM. After PPM received Cranska's letter on October 28, PPM's VP of Risk Management, Brian Thomas, began investigating the claim. PPM hired Dr. Jay Yedlin, a board-certified anesthesiologist, to review Cranska's claim on behalf of their insureds, Dr. Robertson and NRAC. On November 14, 2019, Dr. Yedlin provided PPM with his opinion that esophageal perforation as a result of esophageal intubation does not fall below the standard of care or amount

to negligence. On November 18, Thomas contacted Henning and requested authorization to obtain medical records as part of the investigation. Soon after, PPM hired Mark Williams to represent NRAC and Dr. Robertson.

On November 27, 2019, PPM received a second letter from Henning seeking $291,488.33 in advance-payments (commonly referred to as "*Ridley* payments") for Cranska's medical costs associated with his esophageal injury. Henning also declined Williams's blanket request for authorization to obtain medical records but informed Williams that he would consider such requests on a case-by-case basis. Henning again stated that he believed both liability and damages were reasonably clear but did not specify the amount of damages Cranska was seeking.

On December 12, Williams responded to Henning's letter and explained his position that PPM was not required to make *Ridley* payments in this case under Montana law and that PPM required additional time and information to evaluate the claim. Williams also explained that Cranska's claims were being investigated and that he believed liability with respect to his clients was not yet reasonably clear. Williams also noted that Henning had mistakenly included certain medical expenses as part of the *Ridley* request that were not directly related to the February 12 incident. Finally, Williams requested additional information, including

payments by first party insurers and any out-of-pocket expenses.

*UMIA \ KRMC \ Dr. Kasavana*

On March 5, 2019, KRMC reported Cranska's esophageal perforation to its insurer, UMIA, as a potentially compensable event. UMIA first received notice of Cranska's malpractice claim on December 6, 2019, after KRMC's counsel, Sean Goicoechea, tendered Cranska's claim to FVCC pursuant to the Clinical Training Education Affiliation Agreement between the hospital and the college. UMIA had already assigned Claim Consultant Kim Day to investigate the claim after initially being alerted to the event on March 5. Day determined that Olson and Dr. Robertson were not employees of the hospital, and therefore, KRMC was not liable for their actions. Neither UMIA nor its insureds received a *Ridley* demand letter from Henning.

*ACCO \ FVCC \ Timothy Olson*

On or about December 6, 2019, FVCC received a tender letter dated December 5, 2019, from Goicoechea, alerting FVCC to Cranska's malpractice claim. FVCC then provided notice of the claim to ACCO on or about December 11, 2019. ACCO assigned Claims Specialist Jacquelyn Daczewitz to handle the claim. As part of the investigation, Daczewitz reviewed FVCC's incident report regarding the failed intubation on February 12, interviewed Olson, and requested additional information from Henning, including all medical bills and wage loss

verification.

On or about February 6, 2020, ACCO received a letter from Henning dated January 28, 2020, demanding *Ridley* payments for medical expenses totaling $240,164.66. Henning declined to grant a blank medical release form but provided the complete hospital chart associated with Cranska's hospitalization and subsequent medical care and asked Daczewitz to follow up with a more detailed request for information if necessary. Regarding Daczewitz's request for wage loss verification, Henning responded that Cranska was self-employed and that he was still in the process of verifying loss of income. Henning again communicated that he believed liability and damages were reasonably clear.

Settlement Demand

On or about April 17, 2020, less than six months after Henning's original letter was sent to NRAC and KRMC, Henning sent another letter to KRMC, ACCO, and PPM demanding $590,164.66 to settle the claim and giving the insurers fourteen days to accept the offer. The letter reiterated Cranska's theories of the case and, for the first time, included a calculation of damages: $240,164.66 for medical expenses, $750,000 for his pain and suffering (3 x $250,000 for each insured), and a minimum of $212,032.00 in lost income for a total of $1,202,196.66 in damages. The letter also restated Cranska's position that liability was reasonably clear but, again, did not cite to any expert opinion or report in

support of this position. Finally, the letter warned Defendants that, unless they "act properly now," Cranska would pursue a bad faith action against Defendants for their handling of his claim. The letter placed a fourteen day time limit to respond to Cranska's demand.

On May 1, 2020, Williams responded to Cranska's demand letter. In his response, Williams reiterated his position with respect to *Ridley* payments and discussed NRAC and Dr. Robertson's defenses to liability. On May 4, Goicoechea sent a letter to Henning in which he pointed out that the April 17 letter was the first time Henning had made any *Ridley* demand to KRMC, that he had not received copies of any medical bills that Henning claimed should be paid under *Ridley*, and that these medical expenses had already been paid by another source. Goicoechea also responded that liability was not reasonably clear with respect to KRMC and that UMIA was still reviewing Cranska's claim against Dr. Kasavana. Goicoechea requested that Henning provide an expert report to support the claim against Dr. Kasavana.

On May 21, 2020, Coffman responded to Henning's April 17 demand letter. Coffman stated that her clients were interested in resolving the matter but "maintain the position [that the settlement] demand is not supported by law or, in some instances, documentation." First, Coffman maintained that liability was not reasonably clear. Second, Coffman argued that Cranska's request for $750,000 in

non-economic damages was in excess of the $250,000 statutory cap under Montana law. Third, Coffman contented there was insufficient documentation to support Cranska's claim for lost income. Coffman concluded that the maximum awardable damages would be closer to $300,000 and offered a global settlement of $125,000 to resolve all claims against FVCC, KRMC, and NRAC.

### Settlement

Henning rejected the global settlement offer on May 29, 2020. In July, all parties agreed to conduct a mediation, which took place on November 16, 2020. Defendants made a global settlement offer of $400,000. The offer was funded by $325,000 from ACCO, $25,000 from FVCC, $25,000 from KRMC, and $25,000 from PPM. Cranska accepted the offer on November 24. Cranska signed a Confidential Release and Settlement Agreement, acknowledging the settlement was "to compromise a disputed claim," and released all claims of any nature, known or unknown, related to the surgery and perforated esophagus—including claims for emotional distress.

## PROCEDURAL BACKGROUND

Cranska brings claims against Defendants under the UTPA and Montana common law for bad faith in their handling of his medical malpractice claim. (Doc. 1.) Cranska alleges that Defendants acted in bad faith by "fail[ing] to properly investigate, evaluate, and make reasonable timely settlement offers in this

case in which liability and damages were reasonably clear" and by "fail[ing] to make advance payments for [Cranska's] medical and other expenses." (*Id.* ¶ 28.) Cranska claims that "Defendant[s] should have made a full and appropriate settlement . . . , and then through a declaratory action or other legal avenue, pursued appropriate resolution between themselves." (*Id.* ¶ 33.) Count 1 of the complaint asserts a claim under the UTPA, pursuant to Mont. Code Ann. §§ 33-18-242 and 33-18-201 (2021).[2] (*See id.* ¶¶ 45–48.) Count 2 asserts a common law bad faith claim based on the same facts. (*See id.* ¶¶ 42–44.) Count 3 asserts a claim for punitive damages. (*See id.* ¶¶ 49–50.) Cranska is seeking $2,000,000.00 in compensatory damages and $18,000,000 in punitive damages. (Doc. 64 ¶¶ 73–74.)

Each Defendant has moved for summary judgment. Because the arguments presented by each insurer are largely identical, the Court will address Defendants' arguments collectively. Where unique arguments have been raised by one or more of the Defendants, the Court will address those arguments separately.

## LEGAL STANDARD

This Court can resolve an issue summarily if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of

[2] The Court notes that § 33-18-201 provides its own cause of action where a claimant may allege that an insurer has engaged in certain prohibited claims practices "with such frequency as to indicate a general business practice." This cause of action may be brought independently from § 33-18-242; however, it does not appear that Cranska is bringing separate claims regarding Defendants' general business practices under § 33-18-201.

law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

### I. Liability under the UTPA (Count 1)

The UTPA provides "a third-party claimant an independent cause of action against an insurer for actual damages caused by the insurer's violation of 33-18-201(1), (4), (5), (6), (9), or (13)." Mont. Code Ann. § 33-18-242(1) (2021).[3] The provisions of § 33-18-201 relevant to this case state that it is unlawful for an insurer to:

> (4) refuse to pay claims without conducting a reasonable investigation based upon all available information;
> (5) fail to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
> (6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; [and/or]

[3] Montana Code Annotated was amended in October 2023 to reflect changes made by the Montana legislature during the 68th legislative session. These changes include amendments to the UTPA and other provisions relevant in this matter. However, because Cranska's complaint was filed in September 2021, the Court applies the law in effect at that time.

> (13) fail to promptly settle claims, if liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

*Id.* § 33-18-201(4), (5), (6), (13). The Montana Supreme Court has held that subsections (6) and (13) of § 33-18-201, by their terms, impose a duty on an insurer to pay an injured third party's medical expenses in advance of settlement when liability and causation is reasonably clear. *Ridley v. Guar. Nat'l Ins. Co.*, 951 P.2d 987, 992 (Mont. 1997).

Thus, *Ridley* provides one legal basis for alleging violations of subsections (6) and (13); however, a plaintiff may also allege violations of subsections (6) and (13) without there being a violation of *Ridley*. Here, it appears that Cranska has made allegations under both theories. First, that Defendants violated subsections (6) and (13) by failing to make advance-payments for Cranska's medical and other expenses after a *Ridley* demand had been made. Second, that Defendants violated subsections (6) and (13) by failing to make reasonable timely settlement offers.

**A. Reasonable Basis in Law and Fact for Contesting the Claim or the Amount of the Claim**

Defendants move for summary judgment as to Cranska's UTPA claims on the grounds that they had reasonable bases in law and fact for their handling of

Cranska's underlying malpractice claim. (*See* Docs. 53, 55, 60.)

An insurer may not be held liable for bad faith under the UTPA if it "had a reasonable basis in law or fact for contesting the claim or the amount of the claim, whichever is in issue." Mont. Code Ann. § 33-18-242(5); *see also State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 418 (Mont. 2013). The insurer has the burden of proving it had a reasonable basis to contest the claim by a preponderance of the evidence. *Redies v. Att'ys. Liab. Prot. Soc'y*, 150 P.3d 930, 937 (Mont. 2007).

Reasonableness is generally a question for the trier-of-fact. *Id.; see also Dean v. Austin Mut. Ins. Co.*, 869 P.2d 256, 258 (Mont. 1994) (holding that "whether an insurer has a reasonable basis in law or fact for contesting a claim or the amount of a claim is to be determined as any other disputed issue of fact based upon the evidence and circumstances of each case," not as a matter of law). However, the Montana Supreme Court has adopted two exceptions to the trier-of-fact rule where the insurer's reasonableness is a question of law for the court to decide: (1) where there was clearly no insurance policy in effect at the time the injury occurred; and (2) where, at the summary judgment stage, no facts are in dispute and the underlying basis of law is grounded in a legal conclusion. *Redies*, 150 P.3d at 937. The court further explained that, under the second exception to the trier-in-fact rule, "reasonableness is a question of law for the court to determine

when it depends *entirely* on interpreting relevant legal precedents and evaluating the insurer's proffered defenses under those precedents." *Id.* at 938. The court explained that this distinction "reflects the principle that the jury does not decide or determine the law." *Id.*

**1. Questions of Law**

To determine whether an insurer had a reasonable basis in law for contesting a claim, the Court must look to the relevant legal landscape. "The reviewing court is not to ask whether it 'agrees with the plaintiff's theories of liability in the underlying suit but, rather, whether the insurer's grounds for contesting those theories were reasonable under the existing law." *Freyer*, 312 P.3d at 419 (quoting *Redies*, 150 P.3d at 939). "[A]bsent caselaw on point, 'the determinative question' is whether the law in effect at the time, caselaw or statutory, provided sufficient guidance to signal to a reasonable insurer that its grounds for denying the claim were *not* meritorious." *Freyer*, 312 P.3d at 419 (quoting *Redies*, 150 P.3d at 949) (emphasis added).

In determining whether a proffered defense is reasonable, the Court must consider that "a tort defendant and his or her insurer should . . . be able to test the scope and outer boundaries of legal duties, remedies, and defenses." *Redies*, 150 P.3d at 939. At the same time, a defense may be unreasonable in light of existing law even if the Montana Supreme Court has not "*explicitly* rejected the legal

proposition on which the insurer relied." *Id.* Ultimately, the test is not whether Defendants' position was "correct" but whether, at the time the defense was proffered, it was a reasonable interpretation of the law. *See Freyer*, 312 P.3d at 421 (explaining that an interpretation, while ultimately wrong, may nonetheless have been reasonable).

**a. Expert Opinion on Liability**

First, Defendants argue that they had a reasonable basis in law for contesting Cranska's malpractice claim because Cranska failed to provide expert opinion on liability. (Docs. 53 at 18–19, 55 at 21–23, 60 at 20–23.)

It is well settled under Montana law that, "[w]ith respect to medical malpractice claims in particular, the plaintiff must generally produce expert medical testimony establishing the applicable standard of care and a subsequent departure from that standard" unless the conduct complained of is readily ascertainable to a layman. *Beehler v. E. Radiological Assocs., P.C.*, 289 P.3d 131, 136, 136 n.3 (Mont. 2012). Failure to provide expert testimony on liability is generally fatal to a plaintiff's claim. *Id.*; *see also Griffin v. Moseley*, 234 P.3d 869, 875 (Mont. 2010); *Mont. Deaconess Hosp. v. Gratton*, 545 P.2d 670, 672 (Mont. 1976). However, nothing in Montana's case law or the UTPA itself indicates that a claimant must present expert opinion on liability at the pre-litigation stage in order to establish a valid claim for medical malpractice. Defendants have not cited

any cases where the lack of expert opinion at the pre-litigation stage served as an absolute defense to a UTPA claim, and the Court is aware of none.

Defendants' argument is also inconsistent with public policy and the purpose of the UTPA. It is the "declared public policy" of the State of Montana "to encourage settlement and avoid unnecessary litigation" in order to eliminate cost, stress, and waste of judicial resources. *See Miller v. State Farm Mut. Auto Ins. Co.*, 155 P.3d 1278, 1281 (Mont. 2007). Moreover, the UTPA was intended to regulate the activities of insurers and to ensure insurers operate in good faith when a claim is presented. The UTPA places the burden on the insurer to conduct a reasonable investigation into a claim. *See* Mont. Code Ann. § 33-18-201(4). A "reasonable investigation" may very well require an insurer to hire its own expert to determine liability. Defendants' argument shifts that burden to the claimant and creates an unnecessary barrier to settling cases prior to litigation.

Accordingly, the Court finds that it was not reasonable for Defendants to dispute liability in the underlying malpractice claim based on Cranska's lack of expert opinion. However, the Court notes that the absence of expert opinion remains relevant to the determination of whether liability was "reasonably clear" pursuant to § 33-18-201(6) and (13), which, as discussed below, is a question for the trier-of-fact.

**b. Applicability of *Ridley***

Next, Defendants argue that they had a reasonable basis in law for denying *Ridley* payments because (1) *Ridley* does not require advance payments where medical expenses have already been paid, and (2) *Ridley* does not apply outside of the automobile liability context.[4] (Docs. 53 at 19–20, 55 at 23–25, 60 at 24–25.)

*Ridley* involved an automobile accident in which the plaintiff, Ridley, was injured by a negligent driver. The tortfeasor's insurer acknowledged their insured was ninety percent at fault for the collision but declined to pay medical expenses in advance of final settlement of Ridley's claim. 951 P.2d at 988. Ridley filed a complaint for declaratory judgment on the issue of advance payment of his medical expenses. *Id.* The district court concluded that the UTPA "does not require an insurer to pay an injured party's medical expenses prior to final settlement in all cases, even where liability is reasonable clear." *Id.* The Montana Supreme Court reversed the district court's decision and held that a tortfeasor's insurer is obligated to pay medical expenses as they are incurred and submitted by the tortfeasor's victim when the tortfeasor's liability is reasonably clear and the expenses are causally related to the injury. *Id.* at 992.

First, the Montana Supreme Court has not explicitly addressed whether

[4] The Court notes that Defendant UMIA and its insureds never received a demand for *Ridley* payments and therefore can not be held liable for declining to make such payments. Nonetheless, UMIA has joined its co-defendants in presenting this argument.

*Ridley* payments are required where, as here, medical expenses have been paid by another source. Defendants point out that the majority of Montana district courts that have addressed this issue have held *Ridley* payments are not required under these circumstances. (*See* Doc. 53 at 21 (citing *Bair v. Allstate Ins. Co.*, Cause No. DV-04-514 (Mont. 18th Jud. Dist. Ct. Jan. 7, 2016); *Greenough v. Safeco Ins.*, Cause No. DV-08-766A (Mont. 18th Jud. Dist. Ct. Feb. 12, 2013); *Helms v. Safeco Ins. Co.*, Cause No. DDV-08-1256(a) (Mont. 8th Jud. Dist. Ct. June 3, 2009)).)[5] These courts reasoned that the rationale behind *Ridley* payments would not apply where medical expenses have been paid by another source.

In response, Cranska cites two Montana district court cases holding the opposite. (Doc. 63 at 21–22.) In *Fuchs v. Old Republic Ins. Co.*, the district court explained that the two-part test set forth in *Ridley* and subsequently restated in *Teeter* "are the only two questions an insurer should analyze when determining whether it has an obligation to advance medical expenses or lost wages," and if the two-part test is met, then an insurer must advance payment, "without regard to whether another source has paid those expenses." Cause No. DV-17-936B (Mont. 18th Jud. Dist. Ct. June 13, 2018).[6] In *Cottrell v. Twin Hills Colony*, the district court similarly held that "a showing of hardship or economic pressure to settle the

[5] These district court opinions were attached as Exhibit 1 to Defendant PPM's brief in support of summary judgment. (Doc. 53-1).

[6] This district court opinion was attached as Exhibit 1 to Cranska's brief in opposition to Defendant PPM's motion for summary judgment. (Doc. 63-1.)

lawsuit" is not a requirement under *Ridley*. No. DV-06-4, 2007 Mont. Dist. LEXIS 124, at *3 (12th Jud. Dist. Ct. Mont. April 16, 2007). Cranska also cites to *Teeter v. Mid-Century Ins. Co.*, in which the Montana Supreme Court stated, "the test under *Ridley* consist of two-parts: '(1) whether liability is reasonably clear and (2) whether it is reasonably clear that a medical expense is causally related to the accident.'" 406 P.3d 464, 468 (Mont. 2017).

The Court disagrees that the district courts' holdings in *Fuchs* and *Cottrell* make Defendants' position unreasonable in light of the cases cited by Defendants holding the opposite. Moreover, the court in *Teeter* did not explicitly address the question presented here or reject the courts' holdings in *Bair*, *Greenough*, and *Helms*. In light of the lack of Montana Supreme Court precedent on this question, the holdings in *Bair, Greenough*, and *Helms*, and the rationale behind the court's decision in *Ridley*, the Court concludes that Defendants had a reasonable basis in law to contest Cranska's requested *Ridley* payments.

Second, the Montana Supreme Court has not explicitly addressed whether *Ridley* payments are required outside of the automobile liability context, nor does it appear that any Montana district courts have addressed this issue. In reaching its decision in *Ridley*, the court looked to the plain language of § 33-18-201(6) and (13) as well as the policy rationale behind § 33-18-201 and Montana's mandatory liability protection for motorists under Mont. Code Ann. §§ 61-6-301 to -304. 951

P.2d at 992–93. While the primary basis for its holding was the plain language of the UTPA, the court emphasized that Montana's "mandatory liability insurance law seeks to protect members of the general public who are innocent victims of automobile accidents." *Id.* at 993. The court went on to state that "[o]ne of the most significant obligations that innocent victims of automobile accidents incur[,] and for which mandatory liability insurance laws were enacted, is the obligation to pay costs of medical treatment." *Id.*

Based on the lack of caselaw involving the application of *Ridley* outside of the automobile liability context and the Montana Supreme Court's policy rationale discussion in *Ridley*, the Court finds that it was reasonable for Defendants to contest Cranska's *Ridley* demand on this legal basis as well. The Court is not convinced by Cranska's contention that either of Defendants' arguments would add a new element to *Ridley*'s two-part test. Rather, Defendants' arguments address the contexts in which the two-part test should be applied. The Court also reiterates that the question is not whether the Court agrees that *Ridley* doesn't apply outside of the automobile liability context or where medical expenses have been paid by a collateral source. The question is whether Defendants were reasonable in their interpretation of the law.

Accordingly, the Court concludes that Defendants had at least one reasonable basis in law to contest Cranska's demand for *Ridley* payments.

### c. Statutory Cap on Non-Economic Damages

Defendants ACCO and UMIA also argue that they had a reasonable basis in law to dispute damages in the malpractice claim based on the statutory cap on damages under Montana law. (Docs. 55 at 25–26, 60 at 23–24.)

Under Montana law, non-economic damages in medical malpractice cases are capped at $250,000 per injury, regardless of whether the malpractice claim is based on a single act or a series of acts by one or more healthcare providers. Mont. Code Ann. § 25-9-411(1)(a) (2021). It is undisputed that Cranska's malpractice claim stems from a single injury. Thus, Cranska's non-economic damages were capped at $250,000. Yet, his demand letter clearly requests three times that cap. ACCO's attorney, Coffman, raised this issue in her May 21 response to Cranska's settlement demand, thereby putting Cranska and his attorney on notice that Defendants had a legal basis to dispute the amount of damages being sought. Cranska fails to address this argument in his response to ACCO and UMIA's motions for summary judgment.

The Court concludes, based on the plain language of § 25-9-411(1)(a) and the undisputed facts in this case that Defendants collectively had a reasonably basis in law for contesting the amount of damages presented in Cranska's April 17, 2020, demand letter. This serves as an absolute defense to Cranska's bad faith claims. However, this defense is only applicable to the time after the April 17

demand letter because, prior to that date, Cranska had not presented a dollar figure on damages.

Accordingly, Cranska's claims in this matter are limited to the period of time between when Defendants first learned of the malpractice claim and when the settlement demand outlining damages was presented to the parties. For Defendant PPM, that time period is October 29, 2019 to April 17, 2020. For Defendant UMIA, that time period is December 6, 2019 to April 17, 2020. For Defendant ACCO, that time period is December 11, 2019 to April 17, 2020.

**2. Questions of Fact**

Defendants also raise several defenses rooted in questions of disputed fact in the underlying malpractice claim. As discussed above, when reasonableness is a question of fact, it must be determined by the trier of fact.

First, Defendants argue that liability was not "reasonably clear" as required under §§ 33-18-201(6) and 33-18-201(13). (Docs. 50 at 22–27, 55 at 27–31, 60 at 25–26.) Separately, but similarly, Defendant UMIA argues that liability was not reasonably clear with respect to its insured because "[t]he intubation giving rise to the claim was not performed by KRMC or any employee of KRMC" and under Montana law "a hospital can only be held liable in tort for the acts of an actual or ostensible agent." (Doc. 60 at 20.)

Defendants' arguments rest on the assumption that it is appropriate for the

Court to determine whether liability was "reasonable clear" at the summary judgment stage of a UTPA action based on the existence of disputed material fact regarding the underlying claim. In support of this proposition, Defendants cite cases in which the Montana Supreme Court upheld a district court's "reasonably clear" analysis. (*See* Doc. 53 at 22–24 (citing *Teeter*, 406 P.3d 464; *Depositors Ins. Co. v. Sandidge*, 504 P.3d 477 (Mont. 2022); *Giambra v. Travelers Indem. Co.*, 78 P.3d 880 (Mont. 2003)).) Cranska contends that whether liability was "reasonably clear" is a question of fact for the jury pursuant to the Montana Supreme Court's holdings in *Dean* and *Redies*. The Court agrees with Cranska.

To determine whether liability was "reasonably clear" would necessarily require the Court to determine whether Defendants had a reasonable basis in fact to contest the claim. However, as already explained, the Montana Supreme Court has made it clear that this determination is one for the trier-of-fact. For instance, if the Court were to rule that, in light of the material facts in dispute regarding the malpractice claim, liability was not reasonably clear, then the Court would necessarily be deciding that Defendants had a reasonable basis in fact to contest the claim. Alternatively, if the Court were to rule that liability was reasonably clear, then the Court would necessarily be deciding that Defendants did not have a reasonable basis in fact to contest the claim. Neither outcome is acceptable under Montana law. The Court's approach to this issue is consistent with its own prior

rulings as well as Montana Supreme Court precedent. *See UMIA Ins., Inc. v. Arguelles*, 591 F. Supp. 3d 876, 884 (D. Mont. 2022) (denying summary judgment and explaining that "while a court may resolve an insurer's reasonable basis in law defense, underlying factual disputes must still be resolved by the trier of fact"); *Palmer by Diacon v. Farmers Ins. Exch.*, 861 P.2d 895, 899–903 (Mont. 1993) (holding that whether the insurer had a reasonable basis to deny an underlying claim was a question of fact where there were disputed facts as to how the insured's accident occurred, and thus, whether there was coverage under the policy); *Kephart v. Nat'l Union Fire Ins. Co. of Pittsburgh Pa.*, No. CV-06-97-BLG-CSO, 2008 WL 11347415, at *5–6 (D. Mont. Feb. 5, 2008) (denying summary judgment and holding that whether the insurer had a reasonable basis for contesting the claim was a jury question where there were disputed facts as to whether the insurer acted in good faith).

Moreover, the cases cited by Defendants are distinguishable. *Teeter*, *Depositors Ins. Co.*, and *Giambra* were brought as declaratory judgment actions seeking to resolve whether advance payments were required under *Ridley* prior to the filing of a UTPA or common law bad faith action. The question of whether there was reasonably clear liability was presented to the court under the two-part *Ridley* test, not as a defense to a UTPA or common law bad faith action. Therefore, the principles set forth in *Dean* and *Redies* were not implicated in those

courts' decisions.

Next, ACCO and UMIA argue that Cranska's alleged damages were reasonably disputed based on a lack of supporting information and questions about the appropriate measure of damages. (*See* Docs. 55 at 26, 60 at 23.) These arguments raise questions of fact for the jury. *See Kephart*, 2008 WL 11347415, at *16 (holding that an insurer may argue that it acted in good faith and delayed payment of the claim "because the dollar amount of liability was unclear, but those issues are in dispute and not appropriate for summary judgment").

**B. Other Defenses to Cranska's UTPA Claims**

Defendants also move for summary judgment on the grounds that subsections (4), (5), and (13) do not apply given the undisputed facts in this case. These defenses do not require the Court to determine whether Defendants had a "reasonable basis" for disputing the underlying malpractice claim.

**1. Mont. Code Ann. § 33-18-201(4)**

Defendants contend that Cranska's claim under Mont. Code Ann. § 33-18-201(4) fails because there is no evidence the Defendants "refused" to pay claims. (Docs. 53 at 27, 55 at 31–32, 60 at 27–28.) Cranska did not address this argument in his response to Defendants' motions for summary judgment.

The Montana Supreme Court has explicitly held that an insurer may not "cure" an unreasonable investigation by subsequently paying the claim after a

denial. *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 216 (Mont. 2008); *see also McVey v. USAA Cas. Ins. Co.*, 313 P.3d 191, 195 (Mont. 2013) (same). As the court explained in *Lorang*, to allow this outcome would permit insurers to "simply ignore the UTPA and forego reasonable investigation, or any investigation, until the claimant takes steps to enforce his or her contractual rights, and yet remain immune from liability under § 33-18-201(4) . . . effectively render[ing] the UTPA's mandate meaningless." *Id.*

However, this case is distinguishable from *Lorang* and *McVey* in that Defendants did not "refuse" Cranska's claim. "[T]here must be an initial refusal for a § 33-18-201(4) claim to survive." *Bentle v. Farmers Ins. Exch.*, No. 23-35020, 2023 WL 7549512, at *2 (9th Cir. Nov. 14, 2023). Cranska has not produced any evidence or argument that Defendants outright refused to pay Cranska's claim on behalf of their insureds. It is undisputed that Defendants offered a global settlement of $125,000 and Cranska was ultimately paid $25,000 by PPM, $25,000 by KRMC, at the approval of UMIA, and $325,000 by ACCO.

The Court agrees that because Defendants did not "refuse" to pay Cranska's claim, there was no violation of § 33-18-201(4). Defendants' motions are granted with respect to § 33-18-201(4).

**2. Mont. Code Ann. § 33-18-201(5)**

Defendants contend that Mont. Code Ann. § 33-18-201(5) does not apply

because this is a third-party claim for tort damages. (Docs. 53 at 28–29, 55 at 32–34, 60 at 28–30.) Cranska concedes that he has no viable claim under this provision. Accordingly, Defendants' motions are granted with respect to § 33-18-201(5).

**3. Mont. Code Ann. § 33-18-201(13)**

Defendants also contend that Mont. Code Ann. § 33-18-201(13) is inapplicable because there is no evidence that more than one portion of Defendants' policies were ever at issue or that one portion of a policy was leveraged to influence another portion. (Docs. 53 at 29, 55 at 34–35, 60 at 30.) Cranska failed to address this argument and the Court agrees that the undisputed facts in this case support Defendants' position. Accordingly, Defendants' motions are granted with respect to § 33-18-201(13).

## II. Liability under the Common Law (Count 2)

The UTPA, and specifically § 33-18-242, codified Montana's common law standard of liability for bad faith in denying insurance coverage. *See Palmer*, 861 P.2d at 901. However, § 33-18-242 "does not prohibit a third-party claimant from bringing an action for common law bad faith." *Brewington v. Emps. Fire Ins. Co.*, 992 P.2d 237, 240 (Mont. 1999); *see also Dannels v. BNSF Ry. Co.*, 483 P.3d 495, 500 (Mont. 2021) ("An insurer may also be held liable at common law for bad faith conduct once the underlying claim is resolved."). Just as with claims under

the UTPA, an insurer cannot be held liable for common law bad faith if the insurer had a reasonable basis in law or fact for contesting the claim or the amount of the claim. *Palmer*, 861 P.2d at 901.

Defendants maintain that Cranska has not identified any applicable common law duty outside of the obligations imposed under the UTPA and take the position that his common law bad faith claims fail for the same reasons the UTPA claims fail. (Doc. 53 at 30–31.) Cranska apparently concedes that his common law claims are based entirely on the same facts and legal theories as his UTPA claims. (*See* Doc. 63 at 26.) Accordingly, the Court's analysis of Cranska's UTPA claims applies equally to his common law bad faith claims. *See Brodowy v. Progressive Direct Ins. Co.*, No. CV 22-30-H-KLD, 2023 WL 5670003, at *10–11 (D. Mont. Sept. 1, 2023) (rejecting plaintiff's common law bad faith claims on the same grounds that the Court rejected plaintiff's UTPA claims).

## III. Damages

### A. Compensatory Damages

First, Defendants argue that Cranska's claim for compensatory damages must be denied because he has failed to prove that the claimed damages were proximately caused by Defendants' improper claims handling. Second, Defendants argue that Cranska is not entitled to double recovery for damages already claimed in the underling lawsuit. (Docs. 53 at 32–36, 55 at 37–41, 60 at

32–36.)

In a UTPA action, recoverable compensatory damages are limited to those that were proximately caused by the violation of § 33-18-201(1), (4), (5), (6), (9), or (13). Mont. Code Ann. § 33-18-242(4). However, "a party who raises a parasitic emotional distress claim does not have to demonstrate the heightened standard of proof required for an independent, stand-alone claim of negligent or intentional infliction of emotional distress." *McVey*, 313 P.3d at 195. It is also a fundamental principle under Montana law that compensatory damages are intended "to compensate the injured party for actual loss or injury[—]no more, no less." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1088 (Mont. 2007).

Emotional distress damages are recoverable under the UTPA and in common law if the plaintiff can connect the emotional distress damages to the bad faith action. Cranska is seeking $2,000,000.00 in compensatory damages, which includes damages for his mental and emotional distress resulting from "the unacceptable treatment he received at the hands of the insurers for the defendants in the underlying case." (Doc. 63 at 27.) Cranska alleges that his emotional distress includes "anger and nightmares, lost will, easy distractibility, inability to concentrate, falling asleep during the day easily, and feeling 'cut off at the knees' in his life." (*Id.*) Cranska apparently concedes that he is not entitled to recover damages stemming from the underlying malpractice claim, such as lost wages,

medical bills, or mental and emotional distress resulting from the alleged malpractice.

Cranska may seek compensatory damages for his alleged parasitic emotional distress resulting from the alleged bad faith actions of Defendants.

**B. Punitive Damages**

Defendants next argue that Cranska is not entitled to punitive damages because "there is a complete lack of evidence that would support a claim of actual fraud or actual malice" and without an award of compensatory damages, there can be no punitive damages. (Docs. 53 at 36–37, 55 at 41–42, 60 at 36–37.)

Punitive damages may be assessed in an action brought under the UTPA or common law, so long as compensatory damages have been awarded. Mont. Code Ann. § 33-18-242(4); *Dees v. Am. Nat'l Fire Ins. Co.*, 861 P.2d 141, 149 (Mont. 1993); *see also Est. of Gleason v. Cent. United Life Ins. Co.*, 350 P.3d 349, 357 (Mont. 2015) (stating that "without an award of compensatory damages, there can be no award of punitive damages"). Damages resulting from the alleged bad faith action may be considered compensatory damages for purposes of pursuing punitive damages. *Gleason*, 350 P.3d at 358. To recover punitive damages, a plaintiff must prove by clear and convincing evidence that an insurer acted with "actual fraud or malice." Mont. Code Ann. § 27-1-221 (2021). Liability for punitive damages must be determined by the trier-of-fact. *Id.* § 27-1-201(6).

As addressed above, Cranska may seek compensatory damages for emotional distress resulting from the alleged bad faith actions of Defendants. Whether there is sufficient evidence to support a claim of actual fraud or malice is a question for the trier-of-fact.

**C. Attorneys' Fees and Costs**

Finally, Defendants argue that attorneys' fees are not awardable in third-party UTPA actions or third-party common law bad faith actions. (Docs. 53 at 37, 55 at 42, 60 at 37.)

Indeed, the Montana Supreme Court has expressly held that attorneys' fees are not recoverable in third-party UTPA or third-party common-law bad faith actions. *Sampson v. Nat'l Farmers Union Prop. & Cas. Co.*, 144 P.3d 797, 799 (Mont. 2006) ("The Legislature did not construct the UTPA to provide for the recovery of attorney fees and therefore we cannot construe it to do so."); *Jacobsen v. Allstate Ins. Co.*, 215 P.3d 649, 664 (Mont. 2009) ("Given that the legislature has not deemed an award of attorney fees appropriate under the UTPA, it would be inconsistent to allow such damages to a third party claimant under the common law."). Cranska does not dispute that attorneys' fees are not awardable but asks that the Court not "preemptively rule that there are no circumstances in which an award of attorneys' fees could be made." (Doc. 63 at 30.) Cranska failed to provide an example of such circumstances and the authority on this issue is clear.

Cranska may not seek an award of attorneys' fees in this matter.

## CONCLUSION

In conclusion, Defendants had a reasonable basis in law to dispute Cranska's demand for *Ridley* payments and Cranska's claim for damages as presented in the April 17, 2020, settlement demand. Moreover, § 33-18-201(4), (5), and (13) are not applicable given the undisputed facts in this case. Accordingly, the only issues remaining are whether Defendants violated § 33-18-201(6) or a common law duty by neglecting to attempt in good faith to effectuate prompt, fair, and equitable settlement of Cranska's claim in the time period between when Defendants first learned of the malpractice claim and when the settlement demand outlining damages was presented to the parties. These are questions for the jury. For Defendant PPM, the relevant time period is October 29, 2019 to April 17, 2020. For Defendant UMIA, the relevant time period is December 6, 2019 to April 17, 2020. For Defendant ACCO, the relevant time period is December 11, 2019 to April 17, 2020.

Furthermore, Cranska may only seek compensatory damages for emotional distress that he can prove was proximately caused by a violation of § 33-18-201(6) or a common law duty. If the jury awards Cranska compensatory damages, then the jury will decide whether punitive damages are appropriate. Cranska may not seek an award of attorneys' fees.

Accordingly, IT IS ORDERED that Defendant PPM's Motion for Summary Judgment (Doc. 52) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendant ACCO's Motion for Summary Judgment (Doc. 54) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendant UMIA's Motion for Summary Judgment (Doc. 59) is GRANTED in part and DENIED in part.

DATED this 2nd day of January, 2024.

Dana L. Christensen, District Judge
United States District Court