IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| STEPHEN CRANSKA, | CV 21–104–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| UMIA INSURANCE, INC.; AMERICAN CASUALTY COMPANY OF READING PENNSYLVANIA; PREFERRED PHYSICIANS MEDICAL RISK RETENTION GROUP; and JOHN DOES 1-15, | |
| Defendants. | |

Before the Court are Defendants' joint motions to exclude expert testimony (Docs. 35, 71) and combined motions in limine (Doc. 83), as well as Plaintiff Stephen Cranska's motion to exclude expert testimony (Doc. 27) and combined motions in limine (Doc. 85).

**FACTUAL BACKGROUND**[1]

On February 12, 2019, Plaintiff Stephen Cranska underwent prostate surgery at Kalispell Regional Medical Center ("KRMC").  Several hours after the surgery,

---

[1] For a more detailed discussion on the factual background of this case, see the Court's Order on summary judgment dated January 2, 2024 (Doc. 97).

Cranska complained of a sore throat and difficulty breathing.  Cranska was diagnosed with a perforated esophagus and remained hospitalized, requiring additional surgery to repair his esophagus and treatment for a subsequent infection.

At the time of Cranska's surgery, Defendant UMIA was the insurance carrier for KRMC; Defendant PPM was the insurance carrier for Dr. Cory Robertson of Northern Rockies Anesthesia Consultants ("NRAC"); and Defendant ACCO was the insurance carrier for Flathead Valley Community College ("FVCC") and its paramedic students.

FVCC had an agreement with KRMC that allowed FVCC paramedic students to receive training at KRMC.  On the day of Cranska's surgery, FVCC student Timothy Olson was at KRMC training for intubations.  Olson attempted an intubation of Cranska but misplaced the tube in Cranska's esophagus.  Dr. Robertson, the anesthesiologist for Cranska's procedure, took over and successfully completed the intubation.

On October 28, 2019, Cranska presented his medical malpractice claim to NRAC and KRMC through a letter from his attorney.  The letter explained that Cranska was pursuing "a medical malpractice claim related to a perforated esophagus he suffered on 2/12/2019 at [KRMC]."  PPM received the letter on October 28, 2019; Defendant UMIA received notice of the claim on December 6, 2019; and Defendant ACCO received notice of the claim on December 11, 2019.

2

Cranska made demands for advance-payments of his medical expenses (*Ridley* payments) to PPM and ACCO on November 27, 2019, and February 6, 2020, respectively.  Both PPM and ACCO declined to make advance payments. On or about April 17, 2020, Cranska sent a letter to Defendants claiming $1,202,196.66 in damages and demanding $590,164.66 to settle the malpractice claim.

In a letter dated May 21, 2020, ACCO made a global settlement offer of $125,000, to be funded by each of the Defendants.  Cranska rejected the offer and the parties subsequently agreed to mediate their dispute.  Mediation took place on November 16, 2020.  Defendants made a global settlement offer of $400,000, funded by $325,000 from ACCO, $25,000 from FVCC, $25,000 from KRMC, and $25,000 from PPM.  On November 24, 2020, Cranska accepted the offer and signed a Confidential Release and Settlement Agreement, acknowledging the settlement was "to compromise a disputed claim," and released all claims of any nature, known or unknown, related to the surgery and perforated esophagus— including claims for emotional distress.

## PROCEDURAL BACKGROUND

Cranska brought claims against Defendants under the UTPA and Montana common law for bad faith in their handling of his medical malpractice claim. (Doc. 1.)  Cranska alleged that Defendants acted in bad faith by "fail[ing] to

3

properly investigate, evaluate, and make reasonable timely settlement offers in this case in which liability and damages were reasonably clear" and by "fail[ing] to make advance payments for [Cranska's] medical and other expenses." (*Id.* ¶ 28.) Cranska claimed that "Defendant[s] should have made a full and appropriate settlement . . . , and then through a declaratory action or other legal avenue, pursued appropriate resolution between themselves." (*Id.* ¶ 33.)

Count 1 of the complaint asserts a claim under the UTPA, pursuant to Mont. Code Ann. §§ 33-18-242 and 33-18-201 (2021).[2] (*See id.* ¶¶ 45–48.) Count 2 asserts a common law bad faith claim based on the same facts. (*See id.* ¶¶ 42–44.) Count 3 asserts a claim for punitive damages. (*See id.* ¶¶ 49–50.) Cranska is seeking $2,000,000.00 in compensatory damages and $18,000,000 in punitive damages. (Doc. 64 ¶¶ 73–74.)

Defendants each moved for summary judgment and the Court granted summary judgment in part. (Doc. 97.) The Court concluded that Defendants had a reasonable basis in law to dispute Cranska's demand for *Ridley* payments and Cranska's claim for damages as presented in the April 17, 2020, settlement demand. The Court also found that Defendants were entitled to summary judgment as to Cranska's claims under § 33-18-201(4), (5) and (13).

---

[2] Montana Code Annotated was amended in October 2023 to reflect changes made by the Montana legislature during the 68th legislative session. These changes include amendments to the UTPA and other provisions relevant in this matter. However, because Cranska's complaint was filed in September 2021, the Court applies the law in effect at that time.

Accordingly, the Court narrowed the scope of Cranska's claims to whether Defendants violated § 33-18-201(6), or a common law duty, by neglecting to attempt in good faith to effectuate prompt, fair, and equitable settlement of Cranska's claim in the time period between when each Defendant first learned of the malpractice claim and when the settlement demand outlining damages was presented to the parties.  For Defendant PPM, the relevant time period is October 28, 2019 to April 17, 2020.[3]  For Defendant UMIA, the relevant time period is December 6, 2019 to April 17, 2020.  And, for Defendant ACCO, the relevant time period is December 11, 2019 to April 17, 2020.  The Court also explained that whether this duty was triggered—i.e., whether liability had become reasonably clear—is a question for the trier of fact.  The Court also limited Cranska's damages claim, ruling that Cranska may not seek damages stemming from the underlying injury and that he may not seek an award of attorneys' fees.

## LEGAL STANDARD

A motion in limine is a "procedural mechanism" through which questions regarding the admissibility of "testimony or evidence in a particular area" may be resolved before trial.  *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009).  Such in limine rulings are preliminary, and the Court "may always change [its]

---

[3] In its summary judgment Order (Doc. 97), the Court listed the start date for Defendant PPM as October 29.  The Court corrects this date to October 28, the date PPM received the claim letter from Cranska.

mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). "Evidence shall be excluded in limine only when it is shown that the evidence is inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Speaks v. Mazda Motor Corp.*, 118 F. Supp. 3d 1212, 1217 (D. Mont. 2015) (internal quotation marks and citation omitted). Furthermore, a party seeking to exclude evidence should "identify the evidence at issue and state with specificity why such evidence is inadmissible," rather than seeking to "exclude broad categories of evidence." *Ducheneaux v. Lower Yellowstone Rural Elec. Ass'n, Inc.*, No. CV 19-6-BLG-TJC, 2021 WL 2109190, at *1 (D. Mont. May 25, 2021).

Fed. R. Evid. 702 governs the admissibility of expert testimony and provides that a qualified witness may offer an expert opinion only if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

"There 'is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field;'" instead, "the court must determine whether the witness is qualified as an expert by knowledge, skill, experience,

training, or education, and whether the opinion will help the trier of fact." *Trujillo v. Cnty. of Los Angeles*, 751 F. App'x 968, 972 (9th Cir. 2018) (quoting *Santos v. Posadas De P.R. Assocs., Inc.*, 452 F.3d 59, 63 (1st Cir. 2006)).

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* provides a framework for determining the reliability of an expert witness's methodology.  509 U.S. 579 (1993).  The following factors are relevant to the *Daubert* analysis: "(1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community."  *Id.* at 592–94.  In making a *Daubert* determination, the Court is to act as "a gatekeeper, not a factfinder" and should "avoid excluding opinions 'merely because they are impeachable.'"  *Speaks*, 118 F. Supp. 3d at 1218 (citation omitted).

## DISCUSSION

## I.   Defendants' Joint Motions to Exclude Expert Testimony

### 1.  Joint Motion to Exclude Expert Greg Munro

Defendants seek to exclude Cranska's expert, Greg Munro, on the grounds that his testimony about the conduct of the attorneys representing the underlying parties is irrelevant and his testimony impermissibly seeks to instruct the jury on Montana law.  (Doc. 36 at 2.)

Greg Munro is a respected former law professor and practicing attorney offered to testify on a liability insurer's standard of care regarding advance payment of medical expenses (*Ridley* payments) in medical malpractice insurance cases.[4] (Doc. 36-1 at 1.) Munro opines that "because liability was reasonably clear as between the named defendants, those defendants had joint responsibility to timely settle any claim for medical expenses incurred by advancing those amounts." (*Id.* at 9.)

Only relevant evidence is admissible. *See* Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. In its Order on Defendants' motions for summary judgment, the Court ruled that Defendants had an absolute defense for any UTPA claim—and by extension any common law bad faith claim—stemming from Defendants refusal to make *Ridley* payments. (Doc. 97 at 20.) Accordingly, notwithstanding Munro's expertise, his opinions are not relevant to any remaining claims and will be excluded from trial.

## 2. Joint Motion to Exclude Expert Kevin Quinley

Defendants also seek to exclude Cranska's other expert, Kevin Quinley, on

---

[4] Munro certainly meets the threshold requirements of knowledge, skill, experience, training, or education.

the grounds that he offers opinions for which he is unqualified; he offers

impermissible legal opinions; he offers opinions that are inconsistent with Montana

law; and he offers opinions that are irrelevant, unfairly prejudicial, and otherwise

inadmissible.  (Doc. 72 at 10–12.)

Kevin Quinley is an insurance claim specialist with forty-four years of

experience in insurance-claim handling offered to testify on Defendants' claim

handling practices.  (Doc. 73-1 at 6–7.)  Quinley's expert report addresses

insurance industry customs, practices, and norms as they relate to the handling of

claims.  (*Id.* at 6.)  Based on his review of the record in this matter, Quinley opines

that Defendants "failed to handle the claim reasonably and within insurance claim

industry practices and norms."  (*Id.*)  He outlines these failures generally as:

- Failing to acknowledge and act reasonably promptly upon claim communications.
- Failing to implement reasonable standards for promptly investigating claims.
- Failing to pay and delaying Mr. Cranska's claim without conducting a prompt, thorough, objective investigation.
- Failing to try to effectuate prompt, fair, and equitable settlement of a claim that a reasonable medical malpractice claim professional would view as one of reasonably clear liability.
- Unreasonably delaying settlement negotiations.

(*Id.* at 7.)

Defendants argue that "Quinley intends to offer a variety of

impermissible medical opinions at trial" that are outside his expertise,

including his opinion on the adequacy of the informed consent, whether Olson and Dr. Robertson deviated from a medical standard of care, whether KRMC deviated from its standard of care in diagnosing Cranska's injuries, and whether liability was reasonably clear. (Doc. 72 at 13–19.)

The Court will not permit Quinley to offer testimony on matters outside his qualifications. However, the Court disagrees with Defendants' characterization of these opinions. Quinley opines on what a reasonable claim professional reviewing the record would conclude, not on whether medical malpractice occurred. This undoubtedly falls within the role of an insurance claim adjuster—to evaluate a claim and determine the likelihood of success. Thus, Quinley's testimony cannot be offered to rebut the medical opinions of Defendants' experts in the underlying matter; however, Quinley can opine on whether reliance on such opinions was reasonable or within industry norms.

Defendants next argue that Quinley "intends to offer various legal opinions at trial" for which he lacks qualification. (*Id.* at 19.) Specifically, Defendants take issue with Quinley's opinion that Defendants failed "to try to effectuate a prompt, fair, and equitable settlement of a claim that a reasonable medical malpractice claim professional would view as one of reasonably clear liability," (*id.* at 20), and his opinion that Cranska's claim constituted "*res ipsa*" negligence and that Defendants are "jointly and severally liable," (*id.* at

10

21).

"Although an expert witness may express an opinion with respect to an ultimate issue to be decided by the trier of fact under Fed. R. Evid. 704(a), the expert may not 'give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.'" *Jarecke v. Am. Nat'l Prop. & Cas. Co.*, No. CV 13-146-BLG-CSO, 2014 WL 5859535, at *4 (D. Mont. Nov. 12, 2014) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).  In practice, this distinction can be difficult to discern; but, as this Court has previously explained, "an expert may testify as to the facts underlying a plaintiff's allegation that the defendant violated a statute, but the expert can't say that the defendant did, in fact, violate the statute." *Bourdon v. Mountain W. Farm Bureau Mut. Ins. Co.*, No. CV 12–97–M–DWM, 2013 WL 4446968, at *6 (D. Mont. Aug. 15, 2013) (holding that, in the context of a UTPA action, it was improper for an expert to opine that an insurer "violated its duty to promptly, fairly and in good faith settle [the plaintiff's] claims where liability was reasonably clear").

Thus, in the context of this UTPA action, it is improper for Quinley to opine that Defendants violated the UTPA by "failing to try to effectuate a prompt, fair, and equitable settlement of a claim that a reasonable medical malpractice claim professional would view as one of reasonably clear

11

liability" because this language is nearly identical to that of Mont. Code Ann. § 33-18-201(6).  Similarly, Quinley's opinions on whether Cranska's claim constituted "*res ipsa*" negligence and whether Defendants are "jointly and severally liable" invade the province of the jury and the Court's duty to instruct the jury on the law.  Accordingly, the Court will not permit Quinley to testify to these matters.

Next, Defendants argue that Quinley "intends to offer certain opinions that are contrary to Montana law." (Doc. 72 at 22.)  Defendants challenge Quinley's opinion that "Defendants should have taken investigative steps upon notice of an adverse medical incident in early 2019—prior to Cranska's submission of a claim." (*Id.* at 23.)  Defendants also challenge Quinley's opinion that Defendants should have individually settled Cranska's claim then subsequently sought apportionment and contribution from each other. (*Id.* at 24.)

The Court has already limited the relevant timeframe to the period between when Defendants first learned of the malpractice claim and when the settlement demand outlining damages was presented to the parties. (Doc. 97 at 32.)  Moreover, Defendants' obligations under the UTPA did not arise until they were presented with a claim.  *See Coleman Constr., Inc. v. Diamond State Ins. Co.*, No. CV 05-148-M-JCL, 2008 U.S. Dist. LEXIS 44735, at *11 (D.

Mont. June 5, 2008) (explaining that "the duties imposed upon a liability insurer by [the UTPA] are 'triggered' when a claim is made"). Accordingly, Quinley may not testify that any duty arose under the UTPA prior to the date each Defendant was made aware of Cranska's malpractice claim.

Regarding apportionment and contribution, Quinley may testify as to his experience as a claims handler in cases where there are multiple defendants who share liability. Moreover, the Court disagrees with Defendants that Montana law prohibits an insurer from seeking contribution from a third-party after settling a claim. Defendants cite to *Metro Aviation, Inc. v. United States*, 305 P.3d 832 (Mont. 2013). In that case, the Montana Supreme Court addressed whether "a person who has settled a claim with a victim [may] then bring an action for contribution against a joint tortfeasor under [Mont. Code Ann. § 27-1-703], even though the victim never filed a court action." *Metro Aviation*, 305 P.3d at 834. The Court answered that question in the negative. *Id.* at 836. However, *Metro Aviation*'s holding is limited to legal actions pursuant to § 27-1-703 and does not prohibit insurers from entering into an agreement to settle a claim while reserving the right, between one another, to determine how their respective liability should be apportioned through other means such as arbitration or mediation. Accordingly, Quinley may offer testimony that is consistent with the law and his experience on this issue.

13

Defendants next argue that Quinley is not qualified to testify on whether Defendants failed to timely settle Cranska's claim and, further, that his opinion is not based on any facts, data, or reliable methodology. (Doc. 72 at 25–26). To the extent Quinley intends to opine on *Ridley* payments, that issue has been foreclosed. The Court is satisfied that Quinley has a sufficient foundation of knowledge and experience to serve as an expert on standards of care in the insurance-claim adjusting industry, and his proposed testimony is not obviously wholly unreliable.

Defendants also argue that Quinley "intends to offer opinions which rely on information not available to the Defendants when they were adjusting Cranska's underlying claim," including statements made by Cranska during his deposition on July 1, 2022, about the financial pressure he was under to accept the $400,000 settlement offer. (*Id.* at 33.) Defendants' arguments on this issue are best addressed through cross-examination of the witness.

Defendants remaining arguments regarding loss reserves, mission statements, and guidelines are addressed below in Section III.

## II.    Cranska's Motion to Exclude Expert Testimony

Cranska moves to exclude Defendants' expert, Marshal Mickelson, "from testifying on insurance adjusting practices and on an insurance adjuster's standard of care" and to exclude any expert testimony as to whether Defendants violated the

14

UTPA in adjusting Cranska's underlying malpractice claim.  (Doc. 27 at 1–2.)

Marshal Mickelson is an attorney licensed to practice in the State of Montana with "36 years of experience in handling insurance claims and cases for insurers, insureds, and claimants."  (Doc. 28-1 at 24.)  Mickelson's expert report addresses whether Defendants "met the requirements of reasonable and good practices for the adjustment and handling in Montana of an insurance claim and reasonably relied on the advice of defense counsel."  (*Id.*)  Mickelson concludes that Defendants acted with reasonable adjustment practices by "conduct[ing] a prompt and thorough investigation, appropriately rel[ying] on defense counsel's advice, mak[ing] timely decisions, consider[ing] all the evidence [seeking] expert assistance when appropriate and [making] appropriate and timely settlement offers."  (*Id.* at 42.)

Defendants also offer the expert opinion of Victoria Roberts, a claim consultant.  (Doc. 28-1 at 45.)  Roberts has approximately 42 years of experience in insurance claim handling, including as "a claim handler, an officer of several insurance companies, a litigation manager at several insurance companies," and as "an attorney in private practice working with claims professionals in the defense of both insureds and insurance companies."  (*Id.*)  Roberts opines on whether Defendants' "investigation, evaluation and handling" of Cranska's malpractice claim "was consistent with industry norms and standards and reasonable in light of

the circumstances of this claim so as to comply with [the] duty of good faith and fair dealing under Montana law and [the UTPA.]"  (*Id.*)  Like Mickelson, Roberts concludes that the claim handling of each Defendant "was in accordance with industry standards, their claims handling guidelines, and complied with industry standards and practices so as to not cause any damage to [Cranska]."  (*Id.* at 61.)

First, Cranska argues that Mickelson lacks the requisite qualifications to testify on insurance adjusting practices and the standard of care for a claim professional.  (Doc. 28 at 7–8.)  Second, Cranska argues that Mickelson's testimony would be duplicative of Defendants' other expert, Victoria Roberts, who Cranska concedes is qualified to testify on industry norms and standards regarding claims adjusting.  (*Id.* at 8.)  Finally, Cranska seeks to exclude any testimony that invades the province of the jury determine the ultimate issues in this case.  (*Id.* at 15.)

The Court is satisfied that Mickelson is qualified to testify to standard claims adjusting practices.  Mickelson's extensive experience includes evaluation of coverage and claims, consultation on what constitutes reasonable investigations, assisting insurance adjusters in the process of adjusting a claim, provision of coverage opinions to insurers and insureds, and the litigation of coverage matters. (*See* Doc. 28-1 at 23–24.)  The Court has previously allowed attorneys with a similar background and experience to testify about the standards and adjustment

practices in Montana. *See, e.g.*, *N.Y. Marine v. Junkermier*, No. CV-14-83-BMM, 2020 WL 533668, at *1 (D. Mont. Feb. 3, 2020).

The Court also declines to exclude Mickelson's testimony as duplicative. Fed. R. Evid. 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." However, the Court is not convinced that the overlap in substance between the two experts substantially outweighs the probative value of their testimony. Although the two experts reach similar conclusions, they each apply their own unique qualifications to reach these conclusions. The Court finds that these unique perspectives may be beneficial to the factfinder, a touchstone of admissibility for expert testimony. Of course, the Plaintiff may still object to, and the Court may exclude, testimony that arises during trial that is unnecessarily duplicative.

As discussed, the Court will not permit any witness, expert or otherwise, to offer opinions that invade the province of the jury or the Court: this includes statements that liability was or was not reasonably clear or that Defendants did or did not attempt to effectuate prompt, fair, and equitable settlement of a claim, which are opinions that parrot the exact language of the UTPA.

## III.   Defendants' Combined Motions in Limine

In their Combined Motions in Limine (Doc. 83), Defendants raise the

following issues:

> **1. Using damages associated with the underlying malpractice claim to support Cranska's damages in this matter.**

Ruling: GRANTED IN PART.  Defendants seek to bar Cranska from using damages associated with the underlying malpractice claim to support his damages claim in this matter, arguing that the damages stemming from the underlying matter are distinct to those alleged in this matter.  (Doc. 84 at 10.)  Cranska responds that he "will not propose that his damages in the present matter should be mathematically extrapolated from the $400,000 settlement he received in the underlying matter."  (Doc. 89 at 3.)  However, Cranska maintains that the settlement amount "is indicative of the degree of [his] emotional distress caused by Defendants' violation of the UTPA."  (*Id.* at 4.)

The Court has already ruled that Cranska's damages claim in this matter is limited to those damages that were proximately caused by the alleged bad faith conduct, which may include parasitic emotional distress damages.  (Doc. 97 at 28–30.)  Therefore, Cranska is precluded from arguing that he is entitled to damages directly arising from the underlying injury.  However, the Court recognizes that the amount of medical expenses and the total settlement amount may provide useful context for establishing Cranska's alleged emotional distress in the present matter. Accordingly, the Court will permit Cranska to introduce evidence of his medical expenses, the initial settlement offer, and the final settlement amount solely as

18

evidence to support his claim of emotional distress.  To limit the potential for confusion or prejudice, the Court will give a cautionary instruction in each instance that this evidence is introduced as well as a final instruction on the appropriate scope of damages in this matter.  The parties shall provide the Court with proposed instructions on these issues.

    **2.  Any evidence pertaining to underlying counsel's *ad hominem* opinions about Dr. Robertson.**

    Ruling: RESERVE.  Defendants seeks to exclude comments made by underlying defense counsel for ACCO's insureds, Danielle Coffman.   (Doc. 84 at 13.)  Defendants specifically seek to exclude comments made by Coffman to ACCO's Claims Specialist, Jacquelin Daczewitz, in which Coffman stated that Dr. Robertson "seem[ed] intent on throwing [FVCC's] student under the bus, which not only makes him look like an asshole, but is completely unreasonable given the fact that he is the doctor in the room and responsible" and that she would not want Dr. Robertson to be her anesthesiologist in an upcoming surgery.  (*Id.* at 14.) Defendants characterize these comments as "*ad hominem*" attacks against Dr. Robertson and argue that they are "purely inflammatory and are not helpful to the trier of fact." (*Id.* at 14.)  Cranska counterargues that Coffman's statements are indicative of ACCO's evaluation of the malpractice claim.  (Doc. 89 at 7–8.)

    The Court will reserve ruling on the admissibility of these statements until their relevance can be established at trial.  The statements were made between

Coffman and Daczewitz in connection with the underlying malpractice claim and may therefore be relevant to an issue in this case.  The Court notes, however, that these statements were part of an email exchange that occurred after the April 17, 2020, settlement demand.  The first statement was made in an email dated July 7, 2020, (Doc. 64-28), and the second statement was made in an email dated January 4, 2021, (Doc. 84-3).  The Court envisions that some limited evidence arising outside of the time-periods at issue in this case may be relevant, but reserves ruling until trial.

### 3.  Any undisclosed witness.

Ruling: GRANTED.  Neither party may call any undisclosed witnesses, other than those used for impeachment.  Fed. R. Civ. P. 26.

### 4.  Evidence of loss reserves.

Ruling: GRANTED IN PART.  Defendants argue that "[b]ecause loss reserves are statutorily required and only indicative of an insurer's estimation of maximum liability, any evidence of the loss reserves set aside by Defendants is irrelevant."  (Doc. 84 at 21.)

Although inadmissible to prove liability, value of a claim, or settlement authority, loss reserves may be relevant to whether an insurer acted in bad faith. *See, e.g.*, *Wheeler v. GEICO Gen. Ins. Co.*, No. CV 04-83-M-DWM, 2006 WL 8435976, at *2 (D. Mont. Apr. 18, 2006) (holding that evidence of loss reserves

"could be probative of whether [defendant-insurer] properly investigated and evaluated [plaintiff-insured's] claim").  For example, the amount of an insurer's loss reserves may be relevant to the question of bad faith where "the difference in value between the [loss] reserve and the [settlement] offer is sizeable" and the insurer's position on settlement is "enduring."  *Phillips v. USAA Cas. Ins. Co.*, No. 2:16-CV-0381-TOR, 2017 WL 3616420, at *2 (E.D. Wash. July 14, 2017). However, the Court is also mindful that admitting evidence of loss reserves may entice an insurer to "'manipulate its reserves' to be consistent with its settlement position."  *Id.* (quoting *Miller v. Kenny*, 325 P.3d 278, 298 (Wash. Ct. App. 2014)).

Cranska concedes that evidence of loss reserves cannot be used as evidence of liability or settlement authority.  (Doc. 89 at 11.)  However, Cranska contends that evidence of Defendants' loss reserves remains "relevant and admissible in determining whether Defendants fulfilled their duties in adjusting Cranska's claim in good faith."  (*Id.*)  Cranska has offered evidence that Defendant PPM's loss reserve was set at $500,000, yet PPM only offered $25,000 toward settlement. (*Id.*)  Cranska's expert, Kevin Quinley, also considered PPM's loss reserve in his analysis.  (Doc. 73-1 at 38.)

First, the Court notes that Cranska does not appear to have offered evidence of ACCO or UMIA's loss reserves, nor does Cranska raise these loss reserves in response to Defendants' motion in limine.  Accordingly, the Court understands

21

Cranska's position on loss reserves to be limited to PPM.  Regarding PPM's loss reserve, the difference between the loss reserve and the settlement offer from PPM was sizeable and PPM's offer of $25,000 toward settlement appears to have been enduring throughout the settlement negotiation.  Accordingly, the Court finds that this evidence is admissible for the limited purpose of determining whether Defendant PPM fulfilled its duties in adjusting Cranska's claim in good faith, not as evidence of liability, the value of the claim, or settlement authority.  The parties shall propose a cautionary instruction for the Court to provide when this evidence is introduced.

### 5. Evidence of corporate mission statements and claim handling guidelines.

Ruling: RESERVE.  Defendants argue that evidence of their mission statements and claim handling guidelines is irrelevant to the alleged bad faith at issue here because "the standard for reasonable conduct is divorced from these internal guidelines." (Doc. 91 at 12.)  Cranska responds that "whether Defendants followed their own claim handling procedures and lived up to their mission statements is relevant to whether they acted in good faith." (Doc. 89 at 13.)  The Court agrees that his evidence may be relevant and probative.  However, neither party has provided specific reference to the statements or guidelines that may be introduced at trial.  As such, the Court reserves ruling until the relevance of this evidence can be properly adduced at trial.

### 6.  Arguments related to the golden rule or reptile theory.

Ruling: GRANTED.  Montana state courts have previously stated this type of argument is inadmissible because "it encourages jurors to exercise personal bias rather than objectivity and neutrality based on the evidence presented."  *See Lemm v. Goyins*, No. ADV-2004-43, 2005 Mont. Dist. LEXIS 1424, at *3 (1st Jud. Dist. Ct. Mont. Nov. 9, 2005); *Patch v. Hillerich & Brasby Co.*, No. CDV-2006-397, 2008 Mont. Dist. LEXIS 116, at *13–15 (1st Jud. Dist. Ct. Mont. Mar. 31, 2008). This Court has reached the same conclusion.  *See Eriksen v. Wal-Mart Stores, Inc.*, No. CV 14-155-BLG-SPW, 2017 WL 1497870, at *2 (D. Mont. Apr. 25, 2017); *Teague v. Remington Arms Co., LLC*, No. CV 18-184-M-DLC, 2022 WL 17103236, at *15 (D. Mont. Nov. 22, 2022); *Gallegos ex rel. Est. of Moe v. BNSF Ry. Co.*, No. CV 22-68-M-DLC, 2023 WL 8187923, at *4 (D. Mont. Nov. 27, 2023).

### 7.  The parties' financial status.

Ruling:  GRANTED IN PART.  Cranska concedes that the financial condition of the parties is not relevant with respect to liability but maintains that such evidence is relevant with respect to punitive damages.  (Doc. 89 at 14.) Pursuant to Montana law:

> Evidence regarding a defendant's financial affairs, financial condition, and net worth is not admissible in a trial to determine whether a defendant is liable for punitive damages. When the jury returns a verdict finding a defendant liable for punitive damages, the amount of

> punitive damages must then be determined by the jury in an immediate, separate proceeding and be submitted to the judge for review . . . . In the separate proceeding to determine the amount of punitive damages to be awarded, the defendant's financial affairs, financial condition, and net worth *must* be considered.

Mont. Code Ann. § 27-1-221(7)(a) (2021) (emphasis added).  Accordingly, the Court grants Defendants' motion with the caveat that this evidence will be admissible to determine the appropriate amount of punitive damages, should the jury find any of the Defendants liable for punitive damages.

### 8. Federal Rule of Evidence 615.

Ruling: GRANTED.  Pursuant to Fed. R. Evid. 615, witnesses will be excluded from the courtroom so that they cannot hear other witnesses' testimony, except that Cranska and Defendants' representatives may be present in the courtroom throughout the trial, non-party witnesses may observe voir dire and/or opening statements, and witnesses may observe trial after testifying.

### 9. Display of exhibits not yet admitted.

Ruling: GRANTED.  The Court will not allow the jury to view evidence that has not been properly admitted.

## IV.  Cranska's Combined Motions in Limine

In his Combined Motions in Limine (Doc. 85), Cranska raises the following issues:

### 1. Arguments based on information from other Defendants' claim files unless the Defendant can show that it was aware of and relied on the information at the time the decisions were made.

Ruling: RESERVE.  Cranska argues that Defendants should not be able to cross-reference and rely on information contained in each other's claim files absent evidence that the information was known to the individual Defendant during the relevant timeframe.  (Doc. 86 at 3.)  The Court agrees that Defendants must lay a proper foundation for any evidence they intend to admit in support of their argument and the Court will instruct the jury that whether an insurer acted in bad faith must be based on "the information possessed by the insurer at the time it adjusted the underlying claim."  *Peterson v. Doctors' Co.*, 170 P.3d 459, 465 (Mont. 2007).  However, Cranska's motion is overly broad and unspecific, and the Court must therefore reserve ruling.

### 2. Arguments that Cranska was required to present expert testimony or unrelated pre-injury medical records to support his pre-litigation claim.

Ruling: GRANTED.  The Court has already ruled that, as a matter of law, Cranska was not required to present expert testimony to support his pre-litigation claim.  (Doc. 97 at 16.)  Similarly, the Court finds that Cranska was not required, as a matter of law, to provide pre-injury medical records.  However, the lack of expert testimony remains relevant to the question of whether liability was reasonably clear and Cranska's failure to provide certain medical records may also

prove relevant.  Nonetheless, Defendants may not argue that Cranska was required to present either as a matter of law.

### 3. Cross-examination of witnesses in a manner that is cumulative or duplicative.

Ruling: RESERVE.  The Court must balance the interest in avoiding inefficient and potentially prejudicial presentation of cumulative evidence with each Defendants' right to defend itself in this action.  The Court cannot make such a determination in a vacuum and reserves ruling until trial.

### 4. The amount of attorney's fees Cranska paid in the underlying action.

Ruling: GRANTED.  Defendants do not object to the exclusion of this evidence.  (Doc. 68 at 14.)

### 5. The amount of money paid to medical providers is less than the amount shown on the medical bills.

Ruling: DENIED.  Cranska seeks to exclude "evidence or argument about the difference between the amount of medical expenses [he] incurred . . . versus the amount actually paid to the medical providers."  (Doc. 86 at 8.)  Defendants concede that Cranska should be permitted to introduce "the original amount of the medical bills as evidence of the nature and severity of his underlying injuries," but argue that he should be precluded from arguing that he actually incurred damages in the original amount of the medical bills.  (Doc. 88 at 19–20.)  Defendants propose that the Court instruct the jury that "Cranska could only recover the

amount actually paid to satisfy his medical bills in the underlying malpractice case, and not the portions written off by the providers." (*Id.* at 20.)

Cranska argues that the Montana Supreme Court's holding in *Meek v. Montana Eighth Judicial District Court*, 349 P.3d 493 (Mont. 2015), prohibits Defendants from introducing evidence or argument regarding the amount paid to medical providers by Cranska's insurers. (Doc. 86 at 9.) In *Meek*, the court addressed whether the district court "properly limited the evidence that is admissible at trial regarding medical expenses." *Meek*, 349 P.3d at 495. The court held that it was a violation of Montana law for the district court to only admit evidence of the amount insurers actually paid to healthcare providers and to exclude evidence of the total amount billed.

However, *Meek* is not applicable to the facts of this case. The Court has already ruled that Cranska is not entitled to recover damages stemming from the underlying malpractice claim, including the cost of medical bills. Accordingly, what portion of the medical bills Cranska would have been entitled to recover as part of his malpractice claim is irrelevant to any issue in this matter. However, the Court will permit Cranska to introduce his medical bills as evidence to support his claim of emotional distress. Because this evidence may be presented to the jury for this limited purpose, the Court agrees with Defendants that the jury should not be misled to believe that Cranska would have been personally liable for the entirety of

27

the amount actually billed by the providers.  Cranska would not have been liable

for any amount that was written off by the providers and Defendants are entitled to

present this argument.  As discussed above, the Court will provide the jury with a

cautionary instruction regarding evidence of Cranska's medical bills.

### 6.   Expert or hybrid witness offering legal conclusions or opinions which invade the province of the jury.

Ruling: GRANTED.  As already discussed, no witness will be permitted to

offer opinions that invade the province of the jury or the Court.

CONCLUSION

The parties will not be permitted to introduce evidence or argument

pertaining to *Ridley* payments or any claims other than the surviving claim under §

33-18-201(6) and the corresponding common law duty.  Thus, the Court excludes

the testimony of Plaintiff's expert Greg Munro.  The Court has also limited the

relevant timeframe in this matter.  Although some evidence may have arisen

outside of that timeframe that may prove relevant, the Court reserves ruling on its

admissibility until trial.

Additionally, the parties will not be permitted to introduce evidence or

argument that invades the province of the jury or the Court, including expert

testimony that liability was or was not "reasonably clear" or that Defendants did or

did not attempt to effectuate prompt, fair, and equitable settlement of a claim.  No

experts will be permitted to testify to matters outside of their qualifications or

28

matters not contained in their expert reports.  Nor will experts be permitted to testify contrary to Montana law.  In this regard, Plaintiff's expert Kevin Quinley may not testify that Defendants could have settled the malpractice claim and subsequently sought contribution from one another pursuant to Mont. Code Ann. § 27-1-703.  Quinley also may not testify that any duty arose under the UTPA prior to the date each Defendant was made aware of Cranska's malpractice claim.

The Court will exclude evidence and/or argument on the golden rule, reptile theory, and the amount of attorney's fees Cranska paid in the underlying action. Evidence of the parties' financial status shall be excluded from trial unless and until the stage of the proceedings in which the jury must determine the appropriate amount of punitive damages.  Evidence of PPM's loss reserve is admissible for the limited purpose of determining whether PPM fulfilled its duties in adjusting Cranska's claim in good faith, not as evidence of liability, the value of the claim, or settlement authority.

Defendants may not argue that Cranska was required, as a matter of law, to present expert testimony or unrelated pre-injury medical records to support his malpractice claim.   Defendants must lay a proper foundation before cross-referencing evidence contained in another Defendant's claim file.  Neither party may call any undisclosed witnesses, other than those used for impeachment. Witnesses will be excluded from the courtroom pursuant to Fed. R. Evid. 615,

except that Cranska and Defendants' representatives may be present in the courtroom throughout the trial, non-party witnesses may observe voir dire and/or opening statements, and witnesses may observe trial after testifying. The Court will not allow the jury to view evidence that has not been properly admitted.

The Court reserves ruling on several evidentiary matters and will resolve these issues as they arise during trial. The Court may also revisit any of its evidentiary rulings during trial.

Accordingly, IT IS ORDERED that Defendants' Joint Motion to Exclude Expert Greg Munro (Doc. 35) is GRANTED.

IT IS FURTHER ORDERED that Defendants' Joint Motion to Exclude Expert Kevin Quinley (Doc. 71) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Cranska's Motion to Exclude Expert Witness Testimony (Doc. 27) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendants' Combined Motions in Limine (Doc. 83) are GRANTED in part, DENIED in part, and the Court RESERVES ruling on the remaining matters.

IT IS FURTHER ORDERED that Cranska's Combined Motions in Limine (Doc. 85) are GRANTED in part, DENIED in part, and the Court RESERVES ruling on the remaining matters.

IT IS FURTHER ORDERED that the parties shall propose cautionary and

final instructions regarding the limited purpose of Cranska's medical bills, the initial settlement offer, the final settlement amount, and PPM's loss reserve.  The parties shall exercise their best efforts to reach agreement on these instructions.

IT IS FURTHER ORDERED that where the parties seek to introduce evidence on which the Court has reserved ruling, counsel shall advise the Court of the proposed evidence before it is introduced.  Counsel shall raise these issues outside the presence of the jury either before or after trial each day or during a break in trial.

IT IS FURTHER ORDERED that trial in this matter remains set for February 5, 2024, with a final pretrial conference to be held on January 25, 2024, at 2:30 p.m. in the courtroom at the Russell Smith Federal Courthouse in Missoula, Montana.  The parties shall continue to follow the Court's revised scheduling order (Doc. 51).

DATED this 10th day of January, 2024.

Dana L. Christensen, District Judge
United States District Court